IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOSHUA KRUGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  20-cv-24-RJD |
| | ) | |
| JACQUELINE LASHROOK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

This matter comes before the Court on Defendants' Motions for Summary Judgment. Docs. 218-220, 227.  Plaintiff filed Responses (Docs. 228, 229, 230, 239) and Defendants filed Replies (Docs. 233, 234, 241, 243).   As explained further, Defendants' Motions are GRANTED IN PART AND DENIED IN PART.

**Background and Procedural History**

Plaintiff Joshua Kruger, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pro se and pursuant to 42 U.S.C. § 1983.   He alleged that his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard") from November 2017-September 2018.   Doc. 12.   In his First Amended Complaint, Plaintiff generally alleged that Defendants were deliberately indifferent to his conditions of confinement, as well as his physical and mental health.   *Id*.   The Court recruited Attorney Russell Chibe of the law firm Barnes & Thornburg to represent Plaintiff.   Doc. 98.   Attorney Chibe requested and received leave to amend Plaintiff's Complaint, including claims related to Plaintiff's time at Pontiac Correctional Center starting in September 2018.   Doc. 126.   After the Court ruled

on Defendants' Motions to Dismiss various claims in the Second Amended Complaint, this case proceeded on the following claims:

Count One:     Eight Amendment conditions of confinement claim against Defendants Lashbrook, Milleur, McCaleb, Matheny, and Royster for placing Plaintiff in a deplorable segregation cell without adequate bedding and cleaning supplies.

Count Two:     Eighth Amendment conditions of confinement claim against Defendants Lashbrook, Milleur, Siddiqui, Puga, Shicker, and Baldwin for forcing Plaintiff to live around severely mentally ill ("SMI") prisoners.

Count Three:  Eighth Amendment deliberate indifference claim against Defendants Wexford, Siddiqui, Lashbrook, and Baldwin for failing to prescribe more than Excedrin for Plaintiff's migraine headaches and serious back pain.

Count Four:    Eighth Amendment deliberate indifference claim against Wexford for enacting a policy, practice, and/or custom to put the "bottom line of business" before prisoner medical treatment, and treating all pain the same in a "one size fits all" policy that caused Plaintiff to suffer more than necessary with his migraine headaches and back pain.

Count Five:    Eighth Amendment deliberate indifference claim against Defendants Lashbrook, Shicker, Wexford, Puga, Baldwin, Renzi and Sokol for failing to adequately monitor Plaintiff's mental health at Menard and Pontiac, thereby causing Plaintiff injury and violating his constitutional rights.

Count Six:     Eighth Amendment deliberate indifference claim against Defendants Wexford, Shicker, Puga, and Baldwin for forming, enacting, and/or enforcing a policy, practice, and/or custom of not dealing with a prisoner's mental health needs if he was not on psychotropic medication, which caused Plaintiff's mental health to deteriorate.

Count Seven:  State law institutional negligence claim against Wexford.

Attorney Chibe left Barnes & Thornburg and requested permission to withdraw from this case; the undersigned granted his request and other attorneys at Barnes & Thornburg continued to represent Plaintiff until December 4, 2023.  Docs. 123 and 124.  In a Motion to Withdraw,

Plaintiff's attorneys at Barnes & Thornburg explained to the Court that Plaintiff had "stated his dissatisfaction" with the representation provided to him.  Doc. 192.  The Court granted the motion after holding a hearing.  Doc. 201.  The Court then recruited a second attorney to represent Plaintiff.  Doc. 206.  After Defendants filed their Motions for Summary Judgment, Plaintiff's second attorney filed Responses on behalf of Plaintiff.  Docs. 228 and 229.

Plaintiff then filed a motion pro se, requesting that the Court "disqualify" his second attorney and allow him to file his own responses to the Motions for Summary Judgment.  Doc. 230.  Plaintiff falsely claimed that when Barnes & Thornburg withdrew from this case, he "requested this Court allow him to proceed pro se the rest of the way because he wanted the experience of taking a federal civil rights lawsuit to jury trial" but the Court "denied [Plaintiff] his right to proceed pro se and told Kruger he would not be allowed to proceed pro se in this Court's Courtroom."  Doc. 230, p. 2; Doc. 236.  The undersigned ordered Plaintiff to show cause for why he should not be sanctioned for making false statements to the Court.  *Id*.  Plaintiff explained that he "was moving off his own information and belief of past events" and "he did not have the transcript of the hearing available to him to refresh his memory."  Doc. 237.  The undersigned found this explanation sufficient to satisfy the Show Cause Order.  Doc. 238.  Plaintiff was also granted leave to file his own Responses to Defendants' Motions for Summary Judgment.  Docs. 236, 239.  The Court granted Plaintiff's request to terminate his second court-recruited attorney so that he could represent himself.  Doc. 231.

## Material Facts

Defendant Shicker was the Chief of Medical Services for IDOC. Doc. 239, p. 6. Defendant Puga was the Chief of Psychiatry for IDOC.  *Id*.  Defendant Baldwin was the Warden of Menard.  *Id*.  Defendants Milleur, McCaleb, Matheny, and Royster were correctional officers

at Menard. *Id*. None of the parties provide any dates as to when Defendants Shicker, Puga, Baldwin, Milleur, McCaleb, Matheny and Royster held these positions. *Id*.

Defendant Sokol was the Mental Health Services Director at Pontiac starting in May 2018 and was still employed in that position when he gave his deposition on December 28, 2021. Doc. 219-6, pp. 8-9. Defendant Renzi was the "psychological administrator for IDOC" starting in early 2018. *Id*., p. 19. Defendant Siddiqui was ("at all times relevant") a physician employed by Wexford Health Sources, Inc., a private company that provides medical and mental healthcare to inmates pursuant to a contract with IDOC. Doc. 219-3, p. 1; Doc. 239-5, p. 5.

Plaintiff entered the IDOC in 2003 and is serving a natural life sentence. Doc. 228-1, ¶3. He was residing at Pontiac in 2014 and recalls speaking with a psychiatrist, Dr. Dempsey. *Id*., ¶6. Plaintiff told Dr. Dempsey about his history of mental illness and that he had taken psychotropic medications as a child. Doc. 219-1, p. 34; Doc. 229-2, p. 115. Dr. Dempsey told Plaintiff that he or another mental health staff member would follow-up with Plaintiff but never did. Doc. 228-1, ¶8. Prior to this meeting with Dr. Dempsey, Plaintiff had not received mental health treatment since 1995. Doc. 219-1, p. 34. Plaintiff submitted a grievance regarding Dr. Dempsey's failure to follow-up with him. *Id*., pp. 21-22. After submitting that grievance, Plaintiff did not submit any written requests for mental health treatment until late 2017/early 2018. Id., p. 22; Doc. 228-1, ¶29.

Plaintiff transferred to Menard Correctional Center in 2015. Doc. 228-1, ¶9. Plaintiff recalls that upon arrival at Menard, "you walk down a line of officers when your name is called to briefly see a member of the medical staff and mental health staff. They ask you about any medications you are currently taking and if you are feeling suicidal or homicidal. That's it." *Id*., ¶13. Plaintiff tried to elaborate on his mental health problems, but "all they wanted to know was

if I was feeling suicidal or homicidal at the moment." *Id.*, ¶16.    Plaintiff resided in the "North

Uppers" cellhouse at Menard from 2016-2017. *Id.*, ¶¶14-17.   No member of the mental health

staff ever made rounds on his gallery during that time. *Id.*, ¶16.

On November 28, 2017, Plaintiff moved to cell #223 in the North 2 segregation unit

because he was "placed on 'investigative status.'" *Id.*, ¶17.   The only item in cell #223 was an

"old, dirty mattress that was stained with urine and some other brown substance." *Id.*, ¶18.

Plaintiff had no pillow, sheet, blanket, towel, face cloth, soap, or toilet paper.   Doc. 219-1, pp. 92-

93.   Brown liquid "leaked down the walls of the light fixture" and there was black mold all over

the walls, as well as dried feces and food on the inside of the steel door and "tiny plexiglass

window."   Doc. 228-1, ¶19.   Plaintiff asked Defendants McCaleb, Matheny, and Royster (all

correctional officers) if his cell could be cleaned or if he could have cleaning supplies; they denied

his requests.   *Id.*, ¶20.   Plaintiff saw Defendants McCaleb and Matheny daily and "begged them

for cleaning supplies, a bedroll, and [Plaintiff's] personal property," but they refused.   *Id.*

In November and December 2017, Defendant Josh Milleur was a "Major" in rank. *Id.*,

¶21.   Only the Warden has a higher rank than majors. *Id.*, ¶¶21, 22.   Plaintiff spoke with

Defendant Milleur on several occasions regarding the conditions in cell #223 and "begged

Defendant Milleur to make a phone call to the clothing department to get [Plaintiff] a bedroll and

a new mattress and cleaning supplies, or for someone to clean cell #223." *Id.*, ¶22.   Defendant

Milleur told Plaintiff to "file a grievance" and that Plaintiff "shouldn't have come to segregation."

*Id.*   Plaintiff submitted a grievance on December 6, 2017 and the counselor responded on January

10, 2018, instructing Plaintiff to contact his gallery officer for cleaning supplies and a bedroll.

*Id.*, ¶23; Doc. 220-7, pp. 10, 11.   Defendant Lashbrook stated in her Declaration that "there is no

indication" that she reviewed this grievance and the initials and signatures on the grievance

Page **5** of **21**

indicate that an individual "with signature authority" signed the grievance responses on her behalf. Doc. 227, p. 1.   Plaintiff never received a different mattress or cleaning supplies, nor was the cell ever cleaned.   *Id*.

Plaintiff spent 25 days in cell #223 and a total of six months in the North 2 segregation unit at Menard from 2017-2018.   *Id*., ¶¶23, 24.   Numerous "SMI" (seriously mentally ill) prisoners were housed in North 2 during that time.   *Id*., ¶25.   The SMI prisoners would "play Pontiac" a term that comes from the South Mental Health Unit at Pontiac Correctional Center in which prisoners have nothing to do but torment others in the vicinity by "making noise, clapping their hands, and banging and kicking on their doors."   *Id*.   In the North 2 segregation unit, the SMI prisoners would bang on their steel cell doors 24 hours a day.   *Id*.   Plaintiff spoke with Defendant Milleur on "probably" four occasions about "being housed with SMIs"; Defendant Milleur just "laughed it off."   Doc. 219-1, pp. 105-06.   Plaintiff was depressed and could not sleep because of the noise.   Doc. 228-1, ¶25.   Plaintiff submitted a grievance dated February 11, 2018 in which he stated that being housed with SMI offenders was causing him anxiety and depression and that the SMI inmates would bang on their steel doors all day and night.   Doc. 220-7, pp. 3-6. Defendants Lashbrook and Baldwin stated in their Declarations that there is no indication they reviewed this grievance and that individuals with signature authority signed on their behalf.   Doc. 227, pp. 2; Doc. 220-7, pp. 1-2.

Plaintiff requested to be seen on nurse sick call.   Doc. 228-1*,* ¶27.   On January 30, 2018, he told Nurse Nolan that he had migraine headaches and lower back pain from sleeping on an "old, lumpy" and small mattress.   *Id*.   Nurse Nolan told him that Defendant Wexford Health Sources, Inc. ("Wexford") treated "all prisoners' pain the same, whether it was headaches or back pain." *Id*.   Nurse Nolan gave Plaintiff some Ibuprofen and referred Plaintiff to see a physician for his

Page **6** of 21

headaches.  *Id*.; Doc. 219-3, pp. 2-3.   Plaintiff saw Defendant Mohammed Siddiqui, M.D., two

days later.  *Id*., ¶28.   Dr. Siddiqui examined Plaintiff and told Plaintiff that Wexford would "only

provide prisoners with Ibuprofen, Tylenol, or Excedrin."   *Id*.; Doc. 219-1, p. 62.   Dr. Siddiqui

asked Plaintiff whether his back pain or headaches were worse; Plaintiff told him that the

headaches were worse.   Doc. 228-1, ¶28.   Dr. Siddiqui gave Plaintiff Excedrin, but it did not

alleviate Plaintiff's migraines or back pain.   *Id*.   Once Plaintiff left segregation and "was able to

move around and exercise", he no longer had back pain or migraines.   Doc. 219-1, pp. 64, 65.

Plaintiff sought help from the mental health staff at Menard.   Doc. 228-1, ¶29.   Mental

health practitioner ("MHP") R. Mooney evaluated Plaintiff on February 10, 2018.   *Id*., ¶30.

MHP Mooney told Plaintiff that he "should have been on the mental health caseload for years,

but.somehow 'slipped under the radar'…because Wexford and IDOC had a policy to understaff

IDOC prisons so they could make money."   *Id*., ¶21.   At his deposition, Plaintiff explained the

"mental health caseload":

> …when you're on the mental health caseload, you will be seen by a
> mental health practitioner or a psychiatrist in an IDOC facility,
> either whoever works for IDOC or Wexford, at least every 30 days
> or possible every 15 days.  If you're not on the mental health
> caseload, you will not see a mental health practitioner or psychiatrist
> unless you're on suicide watch or they happen to do their rounds….a
> mental health practitioner is supposed to do rounds every week in
> every cell house in IDOC prison, but they do not do that…when
> you're on a mental health caseload, you will see a mental health
> practitioner every month—every 30 days, and you can write to that
> mental health practitioner specifically, and they will..come see you,
> make sure you're straight, and all that.  If you're not on a mental
> health caseload, you don't have that opportunity to get that
> preferential special treatment.

Doc. 219-1, pp. 111-12.   Dr. Sokol explained at his deposition that the "mental health caseload is

people that have been evaluated and deemed appropriate to receive mental health treatment based

on their current symptoms and/or overall level of functioning." Doc. 219-6, pp. 31-32. Inmates with "chronic and severe" mental health conditions are placed on the caseload in an effort "to help stabilize and manage their symptoms." *Id*., p. 66.

MHP Mooney noted that Plaintiff's DSM diagnosis was major depressive disorder. Doc. 219-5, pp. 11-12; Doc. 243, ¶43. After the evaluation with MHP Mooney, Plaintiff was placed on the mental health call line.[1] Doc. 228-1, ¶33. Plaintiff mostly refused the mental health group sessions with other prisoners because SMI prisoners attending the meetings would masturbate and throw feces. *Id*. Unless he was sleeping, he attended individual sessions. *Id*., ¶34. Plaintiff was asked at his deposition "if you want to request mental health care at Menard, which box would that request go in?" and he answered "I guess it would go in the hospital box. I never saw the box that had specifically mental health on the thing. I guess you would put it in the—in the hospital box—sick call box, I guess." Doc. 219-1, p. 17.

Plaintiff provided a declaration by Craig Haney, PhD, a specialist in "psychology and law." Doc. 239-2, p. 5. Dr. Haney's declaration was prepared for another case pending in this district, Case No. 16-cv-600-MAB, *Davis v. Baldwin*, et al. *Id*., p. 4. Dr. Haney toured North 2 at Menard in September 2018. *Id*., p. 10. He noted that that the North House was filthy and dilapidated and the cells were "extremely small and cramped, dank and dirty, with almost no place in them for prisoners to even stand" and that "there was a great deal of noise in the unit the day I toured, with prisoners screaming and doors banging." *Id*., p. 78-79. Dr. Haney stated that "many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depressed mood." *Id.,* p. 42.

---

[1] Plaintiff uses the terms "mental health caseload" and "mental health call line" interchangeably.

Plaintiff transferred to Pontiac Correctional Center ("Pontiac") in September 2018.   Doc. 228-1, ¶36.   Dr. Sokol testified at his deposition that if an inmate was "on the mental health caseload" at his previous facility, then he would be placed on the mental health caseload at Pontiac by the staff member who performs the initial screening upon arrival at Pontiac.   Doc. 219-6, p. 34-37.   Plaintiff saw a female mental health staff member as soon as he arrived at Pontiac.   Doc. 228-1, ¶36.   He told her that he was on the call line at Menard, but she did not place him on the mental health caseload at Pontiac.   *Id.*; Doc. 219-6, p. 43.   She asked if he was on any "psych meds" or feeling suicidal or homicidal.   Doc. 228-1, ¶36.   He told her no.   *Id.*

At his deposition, Plaintiff was asked how to request mental health care at Pontiac, and he said "you would just put [the request] in the bars and just write 'mental health' on it."   Doc. 219-1, p. 17.   Approximately one month after arriving at Pontiac, Plaintiff wrote a kite to mental health staff asking to be placed on the mental health call line.   Doc. 228-1, ¶37.   He was told that his request would be forwarded to Defendant Dr. Sokol or Defendant Dr. Renzi.   *Id.*   Plaintiff never received a response from either Defendant Sokol or Renzi.   *Id.*

After attempting suicide, Plaintiff was placed on crisis watch in May 2019.   Doc. 228-1, ¶38.   He could only wear a suicide smock and stayed in a cell in the South Mental Health Unit with only a mattress where he was observed 24 hours a day.   *Id.*   SMI prisoners were housed around him.   *Id.*   Plaintiff made two more suicide attempts.   *Id.*, ¶¶39, 40.   A lieutenant asked him "if [you] could get moved back to the cellhouse with all [your] friends would [you] stop 'all this tomfoolery'" and Plaintiff answered affirmatively.   *Id.*, ¶40.

Plaintiff saw a counselor in July and September 2019 and a psychologist in December 2019.   *Id.*, ¶41.   At the first visit with the counselor, she told him that he "should have never been taken off the mental health caseload" and she would recommend that he return to the caseload.

Page **9** of **21**

*Id*.  However, at their next visit, the counselor told Plaintiff that unless he was taking "psych meds," he would be kept on the "60-day call line", which meant he would be seen at least once every 60 days by staff in the mental health unit.  *Id*., ¶42.  The psychologist confirmed "unless [Plaintiff] was suicidal or taking medication, it was policy to keep [him] on the 60-day mental health line.  *Id*., ¶43.  After Plaintiff filed this lawsuit, he was placed back on the mental health caseload.  Doc. 219-1, p. 114.

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Counts I and II: Conditions of Confinement

In Count I, Plaintiff alleges that Defendants Lashbrook, Milleur, McCaleb, Matheny, and Royster placed him and (and kept him) "in a deplorable segregation cell without adequate bedding

and cleaning supplies", in violation of the Eighth Amendment.  Doc. 126, ¶47.  Subjecting a prisoner to inhumane conditions violates "the essence of the Eighth Amendment."  *Thomas v. Blackard*, 2 F. 4th 716, 720 (7th Cir. 2021) (*citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must provide "reasonably adequate ventilation, sanitation, bedding, hygienic materials."  *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (internal quotations and citations omitted).

To prevail on this claim, Plaintiff must establish that: 1) he was denied "the minimal civilized measure of life's necessities" (an objective inquiry) that created "an excessive risk to the inmate's health and safety" and 2) Defendants "knew of and disregarded this excessive risk of harm" to Plaintiff (a subjective inquiry).  *Thomas*, 2 F. 4th at 720-21.  The record contains sufficient evidence to meet the objective inquiry against the Defendants in Count I.  Plaintiff's affidavit and deposition testimony reflect that he was denied reasonably adequate sanitation, bedding, and hygienic materials in cell #223 in the North 2 segregation unit for 25 consecutive days starting November 28, 2017.  Defendants point to no evidence that suggests otherwise.[2]

Regarding the subjective inquiry, Plaintiff admits that he only asked Defendant Royster about his cell conditions on one occasion and therefore summary judgment should be granted in favor of Defendant Royster.  However, Plaintiff's deposition and affidavit reflect that he told Defendants Milleur, McCaleb, and Matheny about the conditions on multiple occasions and they took no action.  Again, Defendants point to no evidence that suggests otherwise.  The record therefore indicates that a reasonable jury could find that Defendant Milleur, McCaleb, and

---

[2] In response to Plaintiff's Statement of Material Facts, Defendants Puga, Lashbrook, Shicker, Milleur, McCaleb, Matheny, Royster, Baldwin, and Renzi state repeatedly that Plaintiff's Facts that are supported by his affidavit are "not properly supported by record citation."  This response is puzzling, as Plaintiff clearly cites his affidavit as the support for those material facts.

Matheny violated Plaintiff's Eighth Amendment rights by disregarding an excessive risk of harm to Plaintiff from the condition of cell #223.

Defendant Lashbrook states in her affidavit that she was not aware of the conditions in segregation as described by Plaintiff and that she did not sign the grievances he submitted regarding those conditions.   Nonetheless, Plaintiff's claims against Defendant Lashbrook survive summary judgment if there is evidence that indicates "the warden 'must have known'" about the risk of physical and psychological harm to Plaintiff from the conditions in segregation.   *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016).   The Seventh Circuit has explained that even where an inmate has not submitted a grievance or otherwise directly communicated with the warden about his cell conditions, a jury could infer that the warden is aware of "systematic [prison] conditions."   *Id*. at 1009.   Plaintiff's description of the conditions he encountered in cell #223 does not indicate a systematic issue throughout Menard or even segregation.   In Plaintiff's own words, cell #223 was the "worst" cell he experienced and he was there for 25 days before moving to a different cell in segregation.

The Court reviewed the report submitted by Plaintiff from Dr. Haney for the *Davis* case. Consistent with Plaintiff's description of cell #223, Dr. Haney states that North 2 was "filthy." However, Dr. Haney's observations and opinions were gleaned from a visit to Menard in September 2018, nine months after Plaintiff moved from cell #223.   His observations and opinions are not sufficient for a jury to infer that Defendant Lashbrook was subjectively aware of Plaintiff's conditions in confinement from November-December 2017.

Furthermore, Plaintiff cannot rely upon inadmissible hearsay to survive summary judgment.   *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).   Dr. Haney's report is hearsay and can only be considered if he will offer his opinions in the report via testimony at the trial of

this case.  *See* FED. R. EVID. 801; FED. R. CIV. P. 56(c).  Defendants do not raise hearsay objections to the report; instead, they object that Dr. Haney's opinions and observations are irrelevant and constitute improper character evidence.  Doc. 241, pp. 21-22.  As no explanation has been offered to the Court as to whether Dr. Haney will even testify at trial-much less the purpose for admission of his various opinions-the Court cannot determine relevancy and whether those opinions constitute improper character evidence.  The Court has serious doubts that Dr. Haney will testify at trial, considering that Plaintiff is indigent and representing himself from prison.  The Court also notes that Plaintiff's most recent court recruited attorney did not submit the report in response to Defendants' summary judgment motions (Docs. 228 and 229) and that decision is apparently what prompted Plaintiff to ask the Court to terminate the attorney from this case.  Doc. 230, pp. 2-3.  Assuming Dr. Haney will not testify at trial, the Court questions why Defendants did not raise hearsay objections to his report.

Because Defendants do not raise hearsay objections to Dr. Haney's report, the Court will consider the following evidence for purposes of ruling on Defendants' summary judgment motions: that when Dr. Haney toured North 2 at Menard in September 2018, it was filthy and there was a "great deal of noise" from prisoners screaming and doors banging.  This evidence does not create a genuine issue of material fact as to whether Defendant Lashbrook knew of and disregarded an excessive risk of harm to Plaintiff because of his placement in cell #223 in November-December 2017.  Summary judgment is therefore appropriate in favor of Defendant Lashbrook on Count 1, and pursuant to Plaintiff's admission, also granted in favor of Defendant Royster.  Summary judgment is denied for Defendants Milleur, McCaleb, and Matheny.

In Count II, Plaintiff contends that Defendants Lashbrook, Milleur, Siddiqui, Puga, Shicker, and Baldwin violated his Eighth Amendment rights by forcing him to live around inmates

with serious mental illnesses.   Plaintiff's affidavit and deposition testimony provide sufficient evidence that noise from the SMI inmates caused an excessive risk to his health and safety because he was depressed and unable to sleep.   As for the subjective inquiry required for an Eighth Amendment claim, Plaintiff's affidavit and deposition likewise show that he talked to Defendant Milleur about the noise from the SMI inmates and Defendant Milleur "laughed it off."   However, nothing in the record indicates that any of the other Defendants were aware that noise from SMI inmates in segregation was causing Plaintiff to be depressed and unable to sleep from November 2017-April 2018.   Summary judgment is therefore granted in favor of Defendants Lashbrook, Siddiqui, Puga, Shicker, and Baldwin on Count II.   Summary judgment is denied for Defendant Milleur on Count II.

Count I will proceed to trial against Defendants Milleur, McCaleb, and Matheny.   Count II proceeds to trial against Defendant Milleur. Defendants Milleur, McCaleb, and Matheny ask the Court to find that they are "shielded by the doctrine of qualified immunity….because…the record does not support the conclusion that [they] violated Plaintiff's constitutional rights."   For the same reasons that the Court finds a genuine issue of material fact exists in Count I against Defendants Milleur, McCaleb, and Matheny and in Count II against Defendant Milleur, their request for qualified immunity is denied.

## Counts III and IV: Deliberate indifference to Plaintiff's migraine headaches and severe back pain

In Count III, Plaintiff alleges that Defendants Wexford, Shicker, Siddiqui, Lashbrook, and Baldwin "were deliberately indifferent to [Plaintiff's] serious medical needs when they failed to prescribe anything more than Excedrin for his migraine headaches and serious back pain."   Doc. 126, p. 15.   Plaintiff argues that he has not been able to conduct adequate discovery on this claim

but provides no specific information as to what discovery or information remains outstanding that is relevant to this claim.   For example, he claims that he needs to depose MHP Mooney and his counselor from Pontiac, but their testimony would not be relevant to Counts III and IV. Moreover, the Court notes that, in the nearly six years this case has been pending, the parties have had three years and four months to conduct discovery on the merits of Plaintiff's claims.[3]   Docs. 81, 98.   Plaintiff's request to re-open discovery is DENIED.

To succeed on his deliberate indifference medical claims, Plaintiff must "provide evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [Defendants] [knew] of and disregar[ded] a substantial risk of harm."   *Id*. at 550. Plaintiff's affidavit and deposition testimony contain sufficient evidence to establish that Plaintiff's severe back pain and migraine headaches were objectively serious medical needs. However, there is no evidence in the record that Defendants Shicker, Lashbrook, and Baldwin had any knowledge of Plaintiff's headaches and back pain and therefore summary judgment is granted in their favor on Count III.

As for Dr. Siddiqui, Plaintiff told him about the severe back pain and headaches on February 2, 2018.   Dr. Siddiqui examined Plaintiff, determined that he had migraine headaches, prescribed Excedrin, and did not see Plaintiff again for these complaints.   No reasonable jury could find that Dr. Siddiqui disregarded a substantial risk of harm by prescribing conservative treatment on the first and only time he treated Plaintiff's headaches.   Plaintiff told Dr. Siddiqui that his headaches were worse than his back pain.   Plaintiff's testimony indicates that his back pain resulted from the inability to exercise and move around in segregation.   Dr. Siddiqui's failure

---

[3]  Plaintiff represented himself during six months of that time.

to prescribe additional medicine or stronger medicine or order treatment for Plaintiff's back pain

on this one occasion is, at most, an isolated instance of neglect-not a violation of the Eighth

Amendment.  *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016);

*Brown v. Osmundson*, 38 F. 4th 545, 553 (7th Cir. 2022); *Gutierrez v. Peters*, 111 F.3d 1364, 1375

(7th Cir. 1997).   Summary judgment is appropriate in favor of Dr. Siddiqui.

      Wexford is named in Count III and is the only defendant in Count IV.   To prevail in his

§1983 claims against Wexford, Plaintiff must establish that his Eighth Amendment right to be free

from cruel and unusual punishment was violated by 1) Wexford's express policy; 2) Wexford's

"widespread and persistent practice that amounted to a custom approaching the force of law"; or

3) a Wexford "official with final policymaking authority."  *Howell v. Wexford Health Sources,*

*Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (*citing Monell*, 436 U.S. at 690-91*; Glisson v. Indiana*

*Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).   Plaintiff does not allege a

policy or practice in Count III, but in Count IV alleges that Wexford "enacted the policy, practice,

and/or custom to put the bottom line of business before prisoner medical treatment and treated all

pain the same and issue the same pain medication in a one size fits all policy, practice, and/or

custom causing Mr. Kruger to suffer more than necessary with his migraine headaches and serious

back pain."  Doc. 126, pp. 15-16.

      Plaintiff recalls Nurse Nolan telling him that Wexford treated "all prisoners' pain the same,

whether it was headaches or back pain" when he saw her on nurse sick call on January 30, 2018

and Dr. Siddiqui saying that Wexford only gives prisoners Ibuprofen, Tylenol, or Excedrin.[4]

Considering these statements in the light most favorable to Plaintiff (as the Court must when ruling

---

[4]  Wexford does not object to this evidence as hearsay and therefore the Court assumes that these statements qualify
as admissions by party opponents. FED. R. EVID. 801(d).

on Wexford's Motion for Summary Judgment), the Court can infer that Wexford has official policies or persistent practices to "treat all prisoners' pain the same" and only prescribe Ibuprofen, Tylenol, or Excedrin.   Nonetheless, Wexford cannot be liable to Plaintiff unless those policies caused Plaintiff's Eighth Amendment rights to be violated.   *Arce v. Wexford Health Sources, Inc*., 75 F.4th 673, 682 (7th Cir. 2023).   As discussed above, no reasonable jury could find that Dr. Siddiqui violated Plaintiff's Eighth Amendment rights at the February 2, 2018 visit by prescribing Excedrin to him.

Regarding the January 30, 2018 visit with Nurse Nolan, Plaintiff told Nurse Nolan that his back pain was from sleeping on an "old, lumpy" mattress and that he was having migraine headaches.   Nurse Nolan gave him Ibuprofen and scheduled him to see Dr. Siddiqui for his headaches.   Nothing from this evidence suggests that Nurse Nolan's response to Plaintiff's symptoms was "so 'blatantly inappropriate' that it demonstrated deliberate indifference."   *Id*. at 681, *citing Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).   Because Plaintiff provides no evidence that he received inadequate medical treatment on the two occasions that he complained to Wexford staff about headaches and back pain, he likewise cannot show that a Wexford policy caused a violation of his Eighth Amendment rights.   Summary judgment is therefore granted in favor of Wexford on Count III and IV.

**Count V and VI: Deliberate indifference to Plaintiff's serious mental health needs**

In Count V, Plaintiff alleges that Defendants "Lashbrook, Shicker, Wexford, Puga, Baldwin, Renzi and Sokol formed a policy, practice, and/or custom to understaff the mental health staff of the IDOC prisons, including Menard and Pontiac, in an effort to put business first and save money for Wexford," and therefore Plaintiff was not placed on the mental health caseload at Menard or Pontiac in 2018 and 2019.   Doc. 164, p. 9.   Plaintiff alleges that Defendants

Lashbrook, Shicker, Puga, Baldwin, Renzi, and Sokol are individually liable in Count V and thus he must provide evidence to indicate they "directed the conduct causing the constitutional violation, or if it occurred with [their] knowledge or consent."   *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).   No evidence in the record suggests that Defendants Lashbrook, Shicker, Puga, Baldwin, Renzi, and Sokol directed mental health understaffing in the IDOC prisons to save Wexford money.

As for Wexford, Plaintiff alleges in Count V that his Constitutional rights were violated by its policy to inadequately "monitor prisoners' mental health at Menard and Pontiac, thereby causing Plaintiff injury and violating his Constitutional rights."   Doc. 126, ¶71.   Plaintiff's affidavit and deposition testimony reflect that his depression and anxiety were/are serious medical needs.   Testimony by Dr. Sokol and Plaintiff reflect that placement on the mental health caseload helps inmates manage the symptoms of their mental health conditions.   However, there is no evidence that indicates Plaintiff requested mental health treatment or being placed on the mental health caseload until his mental health was "deteriorating…from being housed in atrocious cell conditions and around the SMI prisoners" in late 2017/early 2018 at Menard.

Plaintiff contends that when he transferred to Menard and Pontiac, the mental health staff who performed his intake assessments should have known that he needed to be placed on the mental health caseload.   Plaintiff supports this argument with evidence of the admission by MHP Mooney that Plaintiff "should have been on the mental health caseload for years, but somehow 'slipped under the radar'…because Wexford and IDOC had a policy to understaff IDOC prisons so they could make money."[5]   For purposes of summary judgment, the Court accepts as true that

---

[5]  None of the defendants argue that this statement is hearsay or otherwise inadmissible.

Page **18** of 21

Plaintiff "slipped under the radar" when staff performed his intake assessments prior to 2018. However, this admission (by itself) does not create a genuine issue of material fact as to whether staff member knew of and disregarded a substantial risk of harm to Plaintiff by failing to place him on the mental health caseload prior to February 2018.   Plaintiff did not bring the failure to place him on the mental health case to the attention of any other staff member in the healthcare unit or otherwise seek mental health treatment.

However, once Plaintiff was placed on the mental health caseload at Menard, Dr. Sokol's testimony indicates that Plaintiff should have remained on the mental health caseload at Pontiac. Moreover, the counselor at Pontiac further admitted that Plaintiff "should have never been taken off the mental health caseload."[6]   This evidence-along with the earlier admission that Plaintiff "slipped under the radar" because Wexford was understaffing the prisons with mental health professionals to be more profitable-leads to an inference that staff knew of and disregarded a substantial risk of harm to Plaintiff by denying him mental health treatment.   Considering the cumulative effect of these admissions and instances where Plaintiff was denied mental health treatment, a reasonable jury could infer that Plaintiff was denied mental health treatment because of Wexford's policy to increase profits by hiring insufficient mental health professionals to staff IDOC prisons.   Accordingly, summary judgment is DENIED as to Wexford in Count V.

Count VI alleges that Defendants Wexford, Shicker, Puga, and Baldwin formed, enacted, and/or enforced a policy or custom "of not dealing with a prisoner's mental health needs if he was not on psychotropic medication, which caused Plaintiff's mental health to deteriorate."   Plaintiff saw a counselor in July and September 2019 who told him that unless he was taking "psych meds,"

---

[6]  None of the defendants argue that this statement is hearsay or otherwise inadmissible.

he would be kept on the "60-day call line" (rather than being seen every 30 days).[7]    Plaintiff then saw a psychologist in December 2019.    Regardless of the existence or enforcement of a policy or custom of "not dealing with a prisoner's mental health needs if he is not on psychotropic medication," the record contains no evidence from which the jury could find that Plaintiff's Eighth Amendment rights were violated because he saw a counselor twice and a psychologist once during a period of six months, as opposed to more frequent or different mental health treatment.    Plaintiff presents no expert testimony regarding the insufficiency of this treatment, nor does he provide his own description of how more frequent or different mental health treatment alleviates his symptoms.    Summary judgment is granted in favor of Defendants on Count VI.[8]

**Count VII: State law institutional negligence**

Plaintiff alleges that "hospitals have a duty…to assume responsibility for the care of their patients" and Wexford "failed to act as a reasonably careful hospital" by failing to adequately supervise the medical personnel, failing to implement proper mental health policies, failing to implement adequate standard of care, failing to implement adequate staffing, failing to maintain screening procedures that identified an inmate's mental issues, and failed to protect the safety of its patients.    No evidence suggests that Wexford failed to protect Plaintiff's safety.    The remaining allegations all involve healing arts malpractice for which an affidavit by Plaintiff is required, establishing that he consulted with a healthcare professional who has determined in a written report that Plaintiff's medical malpractice claim is reasonable and meritorious.    735 ILCS 5/2-622(a)(1); *Young v. United States*, 942 F.3d 349, 351-52 (7th Cir. 2019).    Plaintiff failed to

---

[7]  None of the defendants argue that this statement is hearsay or otherwise inadmissible.

[8]  Plaintiff claims that he has not been able to obtain documents needed from Defendants for this claim, but provides no specific information to establish good cause to re-open discovery.  Plaintiff's request to conduct additional discovery is DENIED.

provide such an affidavit, despite having nearly four years to obtain one.[9]   Count VI is consequently DISMSSED WITH PREJUDICE.   *See id.*

## Conclusion

Defendants' Motions for Summary Judgment (Docs. 218 and 220) are GRANTED IN PART AND DENIED IN PART.   Summary judgment is granted in favor of Defendants on the following claims: Count I as to Defendants Lashbrook and Royster; Count II as to Defendants Lashbrook, Siddiqui, Puga, Shicker, and Baldwin; Count III in its entirety; Count IV in its entirety; Count V as to Defendants Lashbrook, Shicker, Puga, Baldwin, Renzi and Sokol; Count VI in its entirety; Count VII in its entirety.

Defendants Lashbrook, Royster, Siddiqui, Puga, Shicker, Baldwin, Renzi, and Sokol are DISMISSED WITH PREJUDICE.   The Clerk of Court is directed to enter judgment accordingly at the close of the case.   This case proceeds to trial on the following claims: Count I against Defendants Milleur, McCaleb, and Matheny; Count II against Defendant Milleur; Count V against Wexford.

**IT IS SO ORDERED.**

**DATED:   August 28, 2025**

*s/  Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**

---

[9]  Plaintiff's Motion for Leave to file the Second Amended Complaint (containing the "institutional" negligence claim against Wexford) was filed in November 2021. Doc. 108.